IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| STACIE K. JOYNER-PETTWAY, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | )   1:16-cv-892 (LMB/TCB) |
| | ) |
| CVENT, INC., | ) |
| | ) |
| Defendant. | ) |

<u>MEMORANDUM OPINION</u>

Plaintiff Stacie K. Joyner-Pettway ("Joyner-Pettway" or "plaintiff"), proceeding pro se, has filed a complaint alleging that her former employer, Cvent, Inc. ("Cvent" or "defendant") engaged in discrimination on the basis of race and sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., when it fired her on June 1, 2015. On January 10, 2017, defendant filed a Motion for Summary Judgment ("Motion") complete with a notice pursuant to <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975), that the "Court could dismiss this action on the basis of Cvent's papers if [plaintiff did] not file a response" by February 3, 2017. As of February 6, 2017, plaintiff has not filed a response to defendant's Motion, nor has plaintiff filed a witness or exhibit list as required by this Court's scheduling order entered on August 25, 2016. Accordingly, the facts presented by defendant in its Motion and the attached exhibits are deemed admitted. On the basis of those facts, and for the reasons that follow, defendant's Motion will be granted.

I. BACKGROUND

Plaintiff is a woman who is of black and Native American heritage. Def. Ex. 2 at 22:15–16. Cvent, a firm that designs software for event planners, hired plaintiff as a paralegal in its

legal department on January 22, 2013. Def. Statement of Undisputed Material Facts ("SUMF"), [Dkt. 26] at ¶ 1–4. She was Cvent's only paralegal. Id. at ¶ 5. Her duties included maintaining corporate records and filing forms with various state and federal agencies. Id. at ¶ 6.

During the period relevant to this lawsuit, plaintiff's direct supervisor was Lawrence Samuelson ("Samuelson"), Cvent's general counsel. Id. at ¶ 8. Every year, Samuelson prepared a performance review of plaintiff's work. Id. at ¶ 9. His first review was in the latter part of 2013, and was generally positive but also included some constructive feedback, encouraging plaintiff to "(1) Own projects; (2) Initiate projects based on your own analysis; [and] (3) Be dogmatic about deadlines." Id. at ¶ 10 (internal quotation marks omitted). His 2014 review was also positive, with the primary criticism being that plaintiff should "[c]ontinue to focus on detail and work[] towards a perfect work product[.]" Id. at ¶ 13 (internal quotation marks omitted). There is no evidence that plaintiff was ever disciplined before her termination.

Plaintiff received the assignment that ultimately resulted in her termination on Friday, May 22, 2015. Id. at ¶ 16. Samuelson emailed plaintiff to let her know that Cvent would need to file "various financial benchmark surveys" with the United States Department of Commerce's Bureau of Economic Analysis ("BEA"). Id. According to that email, plaintiff was to be the "team lead" for the BEA filing. Id. At her deposition, plaintiff agreed that it was her job "to make sure the filing got done on time." Def. Ex. 2 at 144:4–6.

Samuelson told plaintiff that the filing was due to the BEA by Friday, May 29, 2015, and that "[p]enalties for not making the filing can be up to $25,000 per violation." Def. SUMF at ¶¶ 16–18; Def. Ex. 5. Plaintiff received all the information required for the filing from the finance department by the close of business on Wednesday, May 27, 2015. Def. SUMF at ¶ 19.

2

That same day, plaintiff assured Samuelson that she would review the forms and begin filing them electronically by the next morning. Id.

On the afternoon of Thursday, May 28, 2015, plaintiff learned that Cvent was not permitted to file electronically as a first-time filer with the BEA. Id. at ¶ 21. The same day, one of Cvent's attorneys asked plaintiff if anyone needed to sign the BEA forms. Id. at ¶ 20. Plaintiff looked at the forms, but did not notice the required signature block on the first page. Id. It was not until later that evening that plaintiff realized a signature would be required by Peter Childs ("Childs"), Cvent's Chief Financial Officer. Id. at ¶ 22, 27.

That evening, at 9:04 p.m., Samuelson emailed plaintiff to ask if she was going to file the forms with the BEA the next morning. Id. at 24. She replied that she was planning to file the paper copy the next day by hand delivery. Id. at ¶ 25. At 9:42 a.m. the next morning, Friday, May 29, Samuelson asked again if the filing was going to get done that day. Id. at ¶ 26. Plaintiff replied a few minutes later that she would complete the filing as soon as Childs could sign it, but that Childs was in a meeting. Id. at ¶ 27. Plaintiff was not able to give the forms to Childs until 11:00 a.m., which was the first time that Childs learned about them. Id. at ¶ 28. Childs asked to review the forms before he signed them. Id. ¶ 29. He did not return them to plaintiff until that afternoon. Id. at ¶ 30. Plaintiff never asked Samuelson or anyone else at Cvent for help in getting Childs to sign the forms more expeditiously. Id. at ¶ 38.

When plaintiff received the signed forms from Childs, she made arrangements for the forms to be picked up by a courier and hand-delivered to the BEA. Id. at ¶ 31. At 3:00 p.m., before the courier arrived, plaintiff left the office because she was leaving town that evening and did not wish to miss her flight. Id. at ¶ 32. At 3:42 p.m., Samuelson emailed plaintiff asking for

3

confirmation that the BEA filing had been submitted. Id. at ¶ 33. Plaintiff replied at 3:50 p.m., telling Samuelson that the courier had retrieved the forms but had not yet confirmed delivery. Id.

By the time the courier arrived at the BEA, it had stopped accepting deliveries for the day. Id. at ¶ 34. Accordingly, the forms were not filed on Friday, May 29, 2016. Id. at ¶ 35. Plaintiff emailed Samuelson at 5:10 p.m. to report the failed delivery. Def. Ex. 9. She wrote that she

> [g]ot a call from the courier that no one answered the door where he was directed by the guard to drop off hand deliveries. After going back and forth I was told the drop off closed at 4. I suspected this could be the case and communicated this to the courier when I arranged for the pick-up. The courier stated that he arrived shortly before 4. So I have directed the courier to return the package to Cvent and I have spoken with Brittany who will prepare a FedEx package so that it is at least sent with a May 29 shipment date. I sent an e-mail to the BEA yesterday and called inquiring if postmark dates are acceptable. The number I have for BEA does not provide option [sic] to speak with a live person. Both means of communication fell on deaf ears. I have asked the courier to provide me with documentation evidencing his arrival before 4 in case we need to appeal any late penalty [assessed] by the BEA. He said he can get me something. I will also reach out again to the BEA on this matter.

Id.

At 8:49 p.m., Samuelson replied:

> This is very disappointing. I don't understand how this could have gotten so messed up. You had the relevant info on Tuesday.
> From a practical standpoint, [d]o we need to deliver a cover note explaining our situation? What are the potential penalties for making a late filing?
> This is a serious mistake on execution.

Def. Ex. 10.

Plaintiff received that email as she was boarding her plane that evening. Def. SUMF at ¶ 42. She was "shocked, dazed, and infuriated" by Samuelson's email. Id. at ¶ 43 (internal quotation marks omitted). Although she typed a response on the airplane, she decided not to send it because it "was not the message [she] should have probably sent at that time." Def. Ex. 2 at 122:16–18. She "massaged over that message all weekend long," thinking about how to

4

respond, in part because she was trying to figure out the answer to the question about potential penalties. Id. at 122:22–123:5. She also felt that "anything [she] sent him was going to make matters worse." Id. at 123:14–15.

Plaintiff did not reply to Samuelson until 1:14 a.m. on Monday, June 1, 2015. Def. SUMF at ¶ 45. In her response, she wrote:

> I can understand your concern; however, it was not until yesterday . . . when it was determined we could not file electronically[.] At this time I called and e-mailed BEA (my earlier e-mail . . . was promptly answered so I expected the same timely response) to inquire if paper filings needed to be received by 5/29 or just sent/postmarked. I never received a reply[.] [An attorney] did inquire Thur[sday] afternoon if the forms required signature. I looked over the forms but did not pick up on the sig[nature] block as it was quite small. When doing a final review of the forms on Thursday evening I noticed [one of the forms] required [a] signature[.] I immediately put wheels in motion to get [Child's] signature as soon as I arrived at the office around 8:30AM on Fri[day] and printed the forms. He was in a meeting but I was able to get his attention at some point. To my surprise, he was not aware of the forms so I respected his decision that he needed to look over the forms before signing. I mentioned the plan to send the forms today (Fri[day]) but there was a misunderstanding. He seemed to think it was just a matter of getting them postmarked. Of course, I take responsibility for the miscommunication. As time ticked away, I looked to track down [Childs] and even sent him an e-mail. In the meantime, I prepared a cover letter and copy set for the courier to have date-stamped at the time of delivery. When I contacted the courier shortly after 2 when [Childs] signed I expressed I was concerned that the [BEA] may close or at least stop accepting deliveries at 4 or 4:30[.] The courier service gave me an ETA of 30 min. for pick-up. When no one arrived within the timeframe I called for status. The package was picked up a little after 3. I knew delivery would be tight at this time. Shortly after 4, the courier called to let me know no one answered the door the guard directed him to for delivery. Again, I understand your concern but I think I stayed on top of this matter and took action to the extent I could when obstacles arose. I realize this undermines your trust in my ability to see a project to closure but I wholeheartedly believe any action I could have taken seems to make sense only in hindsight.
> I will contact BEA to confirm if the shipment of the forms via FedEx on May 29th constitutes timely filing. If not, I will confirm if an appeal of any late fee penalty can be submitted.

Def. Ex. 13 at 2–3.

At 11:01 a.m., plaintiff emailed Samuelson again to inform him that she had "reached a live person at BEA and [been] advised that late on Thursday the filing deadline for new filers was extended to June 30, 2015." Id. at 2. This was the first time that anyone at Cvent learned that the BEA had extended the filing deadline for first-time filers. See Def. SUMF at ¶ 46.

Samuelson was "frustrated and concerned" that plaintiff had failed to ensure that the BEA filing was done by the presumptive deadline and that she did not "respond to or even acknowledge his email on Friday night or at any point throughout the weekend." Id. at ¶ 47. He also thought that plaintiff's eventual response did not appropriately accept responsibility for the error. Id. at ¶ 48. In light of these failures, Samuelson decided to fire plaintiff. Id. at ¶ 49. Samuelson informed plaintiff of this decision in the late afternoon on June 1, 2015, in a meeting with a representative from Human Resources. Id. at ¶ 50. Although plaintiff was asked to gather her belongings and leave that day, she was paid for the following week, through June 8, 2015. Id. at ¶ 52.

At no point during her employment with Cvent did plaintiff discuss her racial background with Samuelson. Id. at ¶ 53. Plaintiff admits that Samuelson never made any comments to her about her race or gender. Def. Ex. 2 at 172:10–17. According to plaintiff, she heard Samuelson make a racially motivated comment just one time while working at Cvent, when Samuelson remarked that an African-American insurance salesman was "full of shit." Id. at 172:2–10. Plaintiff considered this comment to be racially motivated because he had never used the phrase about other, white salesman who had given the same "spiel." Id. at 173:13–16.

Plaintiff was the only person disciplined as a result of the BEA filing. All other members of the BEA team were white men, but plaintiff was the only paralegal and the only one considered the "team lead" for the task. See Def. SUMF ¶¶ 11, 56.

6

"In August or September 2015, [p]laintiff became aware that she had 300 days to file a Charge of Discrimination [("Charge")] with the Equal Employment Opportunity Commission ("EEOC")." Stip., [Dkt. 20] at ¶ 25. Plaintiff filed her Charge with the EEOC on March 30, 2016. Id. at ¶ 26. On April 8, 2016, the EEOC issued its right to sue letter to plaintiff. Id. at ¶ 27. Plaintiff filed her complaint in this Court on July 13, 2016. Id. at ¶ 28.

## II. DISCUSSION

### A. Summary Judgment Standard of Review

Summary judgment is appropriate where the record demonstrates that "there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although the Court must view the record "in the light most favorable to the non-moving party," Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 324 (4th Cir. 2012), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" to overcome summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); see also Am. Arms Int'l v. Herbert, 563 F.3d 78, 82 (4th Cir. 2009). Rather, a genuine issue of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. Moreover, "[t]he mere existence of some alleged factual dispute" cannot defeat a motion for summary judgment. Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001). Instead, the dispute must be both "material" and "genuine," meaning that it must have the potential to "affect the outcome of the suit under the governing law." Id.

Where the nonmoving party bears the burden of proof, the party moving for summary judgment may prevail by showing "an absence of evidence to support" an essential element of that party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322–25 (1986); see also Rhodes v. E.I.

du Pont de Nemours & Co., 636 F.3d 88, 94 (4th Cir. 2011). Once the moving party has successfully demonstrated that absence, the nonmoving party must "come forward with specific facts," rather than "metaphysical doubt[s]" or conclusory allegations, that prove that there is a genuine dispute for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (internal quotations omitted); see also Erwin v. United States, 591 F.3d 313, 319 (4th Cir. 2010). Failure to do so "renders all other facts immaterial" and entitles the movant to judgment as a matter of law. Rhodes, 636 F.3d at 94. Under Fed. R. Civ. P. 56(c), "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record. . . [or] showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." The court must "draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion;" however, "those inferences must, in every case, fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." Thompson Everett, Inc. v. Nat'l Cable Adver., L.P., 57 F.3d 1317, 1323 (4th Cir. 1995) (internal quotations and citations omitted).

### B. Timeliness

"In a 'deferral' state, like Virginia, [a charge of discrimination] must be filed [with the appropriate agency] no later than 300 days 'after the alleged unlawful practice occurred . . . .' 29 U.S.C. § 626(d)(2)." Lewis v. Norfolk S. Corp., 271 F. Supp. 2d 807, 811 (E.D. Va. 2003). In the Fourth Circuit, "the filing period runs from the time at which the employee is informed of the allegedly discriminatory employment decision, regardless of when the effects of that decision come to fruition." Price v. Litton Bus. Sys., Inc., 694 F.2d 963, 965 (4th Cir. 1982). "The timing requirements for filing a lawsuit following an EEOC right-to-sue notice have been strictly

construed," and the Supreme Court has cautioned that "equitable tolling is to be used 'sparingly.'" Lewis, 271 F. Supp. 2d at 811 (citing Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990)).

Cvent informed plaintiff of her termination on June 1, 2015. The 300th day fell on Sunday, March 27, 2016, meaning that plaintiff had until Monday, March 28, 2016 to file her EEOC Charge by operation of F. Rule Civ. P. 6(a)(1)(C). Plaintiff did not file the Charge until Wednesday, March 30, 2016, two days late, and she has not raised any grounds that might justify equitable tolling. The untimeliness of the EEOC Charge alone is a sufficient basis to dismiss this civil action, but out of deference to plaintiff's pro se status the Court has also considered the merits of her Title VII claims on the record submitted by defendant.

### C. Title VII Claims

Plaintiff has not produced any evidence of direct discrimination, and must therefore proceed through the burden shifting framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under the McDonnell Douglas framework, plaintiff must first establish a prima facie case of discrimination by showing four elements: (1) she is a member of a protected class; (2) an adverse employment action occurred; (3) at the time of the adverse employment action, she was performing duties "at a level that met the employer's legitimate expectations;" and (4) the job remained open or was filled by someone outside the plaintiff's protected class. See O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 311 (1996).

If a plaintiff succeeds in establishing the prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment decision. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Hux v. City of Newport News, 451 F.3d 311, 314–15 (4th Cir. 2006). Because this is only a burden of

production, the reasons proffered need not ultimately persuade the court. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993).

To overcome a defendant's non-discriminatory reasons, the plaintiff must prove that those reasons were not the real basis for the adverse decision, but in fact pretext for discrimination. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000). This third and final step "merges with the [plaintiff's] ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981). "[I]t is at this third step that McDonnell Douglas identified the significance of comparator evidence: the Court explained that 'especially relevant' to a showing of pretext would be evidence that other employees who were similarly situated to the plaintiff (but for the protected characteristic) were treated more favorably." Laing v. Fed. Exp. Corp., 703 F.3d 713, 719 (4th Cir. 2013) (quoting McDonnell Douglas, 411 U.S. at 804). "To make a comparison, it must be shown that 'the employees dealt with the same supervisor, were subject to the same standards and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" Milladge v. OTO Dev., LLC, No. 1:14-cv-194, 2014 WL 4929508, at *6 (E.D. Va. 2014) (quoting Haywood v. Locke, 387 F. App'x 355, 359 (4th Cir. 2010)).

Plaintiff has failed to make a prima facie case of either race or sex discrimination because she has not shown that she was meeting her employer's non-discriminatory expectations. Samuelson had repeatedly admonished plaintiff to take greater ownership of her tasks, and specifically instructed her to "be dogmatic about deadlines." Nevertheless, despite her position as "team lead," plaintiff failed to ensure that the forms were filed with the BEA by the presumptive deadline. It makes no difference that the actual deadline was extended. Everyone

10

at Cvent, including plaintiff, believed that the deadline was Friday, May 29, 2015. Samuelson considered her failure to meet that deadline or accept responsibility for that failure to be evidence that she was not taking ownership of her projects as directed. Accordingly, the undisputed evidence shows that plaintiff failed to meet her employer's legitimate, non-discriminatory expectations.[1]

Even if plaintiff could satisfy the prima facie case, the defendant has articulated non-discriminatory reasons for firing her, namely her failure to meet the presumptive BEA deadline and respond to Samuelson's inquiry in a timely fashion. Plaintiff has failed to respond to these reasons with any evidence of pretext. Even if Samuelson's comment about the insurance salesman were somehow racially motivated, a single comment about someone other than the plaintiff cannot independently sustain a claim of pretext. See Hale v. Con-Way Transp. Servs., Inc., 428 F. Supp. 2d 471, 477–78 (E.D. Va. 2006).

Plaintiff has also not identified a similarly situated employee at Cvent who received more favorable treatment. In her deposition, she suggested that the company's failure to put her on a performance improvement plan ("PIP") was evidence of pretext, but she admitted that she did not have any information about how often the company decides to put an employee on a PIP as opposed to terminating an employee, nor is there any evidence of what criteria the company uses to decide whether a PIP would be appropriate. See Def. Ex. 2 at 165:10–20. Plaintiff also pointed to a white male member of Cvent's finance department named Ryan Groat ("Groat"), who was not fired despite chronic problems paying legal bills in a timely manner. See id. at 166:15–18. But plaintiff admits that Groat answered to a different supervisor and there is no evidence that missing bill payment deadlines had consequences as dire as the $25,000 penalty for

---

[1] The record also contains no evidence about who, if anyone, replaced plaintiff as Cvent's paralegal.

11

missing a BEA filing. Accordingly, Groat is not an appropriate comparator. See Haywood, 387 F. App'x at 359.

Cvent's decision to fire plaintiff after the events surrounding the BEA filing may have been harsh, but it is not the function of this Court to "sit as a kind of super-personnel department weighing the prudence of employment decisions[.]" DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998) (internal quotation marks and citation omitted). Plaintiff has not produced evidence sufficient to establish a prima facie case of discrimination or that Cvent's stated reasons for firing her were pretextual. Accordingly, Cvent is entitled to judgment as a matter of law as to plaintiff's Title VII claims.

### III. CONCLUSION

For the reasons stated above, defendant's Motion will be granted by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 7th day of February, 2017.

Alexandria, Virginia

/s/ 
Leonie M. Brinkema
United States District Judge